UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

GREGORY MARTINEZ,                          :

                    Plaintiff,    :    15 Civ. 3366 (PGG)(HBP)

     -against-                    :    REPORT AND
                                       RECOMMENDATION
CAROLYN W. COLVIN, ACTING,        :
Commissioner of Social Security
Administration,                   :

                    Defendant.    :

----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE PAUL G. GARDEPHE, United States

District Judge,

I.   Introduction

          Plaintiff Gregory Martinez brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of the Social Security Administration (the

"Commissioner") finding that plaintiff (1) is not a member of the

class action settlement approved in Stieberger v. Sullivan, 792

F. Supp. 1376 (S.D.N.Y. 1992) (Sand, D.J.), as amended in

Stieberger v. Sullivan, 801 F. Supp. 1079, 1082 (S.D.N.Y. 1992)

(Sand, D.J.), and (2) is not entitled to disability insurance

benefits ("DIB") under Title II of the Act from 1984 through 1996 because he was not disabled prior to December 31, 1986, the date last insured ("DLI") applied by the Commissioner.  The parties agree that the Commissioner's decision was erroneous and should be reversed, but disagree on the appropriate relief.

Plaintiff moves for judgment on the pleadings and seeks an Order finding that plaintiff is a <u>Stieberger</u> class member with a DLI of December 31, 1989 and is eligible for DIB as of September 18, 1984.  Alternatively, plaintiff seeks a remand for further proceedings to establish the correct onset date of plaintiff's disability.

The Commissioner, on the other hand, "do[es] not contest that plaintiff was eligible for at least a portion of the period he alleges" (Supplemental Memorandum of Law in Further Support of the Commissioner's Motion for Remand and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated July 29, 2016 (Docket Item ("D.I.") 28) ("Def. Reply"), at 3), but nonetheless opposes plaintiff's motion, arguing that plaintiff is not a member of the <u>Stieberger</u> class.  Instead, the Commissioner seeks remand "solely for the purpose of calculating the amount of plaintiff's benefits" for an as of yet undetermined period of time (Memorandum of Law in Response to Plaintiff's Motion for Judgment on the Pleadings, and in Support of the Commissioner's

Motion for Remand, dated June 24, 2016 (D.I. 27) ("Def. Memo"), at 1).

For the reasons set forth below, I respectfully recommend that plaintiff's motion be denied, that defendant's motion be granted in part and that the matter be remanded to the Commissioner for further proceedings.

II.   Facts[1]

A.   Plaintiff's Background

Plaintiff is a United States citizen and New York resident born on March 5, 1962 (Tr. 171). Plaintiff worked from approximately 1979 to 1984 (Tr. 177, 191-92, 207-08); during the final one to two years of his employment, he worked as a security guard at a parking facility (Tr. 933, 966, 1130-31). The record indicates that plaintiff received general medical care primarily from the William F. Ryan Community Center (the "Ryan Center") from 1980 through at least the date of the present application (October 4, 2004), although plaintiff also consulted with Dr.

_____

[1]I recite only those facts relevant to my review. The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (see Social Security Administration ("SSA") Administrative Record, dated July 8, 2015 (D.I. 9) ("Tr.")) more fully sets out plaintiff's medical history and the procedural history of plaintiff's various claims.

William Kulak with respect to his injuries from 1984 through 1989 and with Dr. Enrique Ergas concerning his condition in 1988.[2]

### 1.   Medical and Treatment History

Given the amount of time plaintiff's application has been pending, the record in this case is quite voluminous and contains records spanning three decades.  Accordingly, I shall only discuss those aspects of plaintiff's medical history that are pertinent to the parties' motions.

On September 18, 1984, plaintiff was struck by a motor vehicle while riding his bicycle, causing him to lose consciousness and to sustain injuries to his lumbosacral spine[3] and right knee (Tr. 688-92).  Following the accident, plaintiff was taken by hospital to St. Vincent's Hospital's Emergency Room, where he was treated and discharged (Tr. 688).  From September 20 through October 4, 1984, plaintiff was hospitalized at North General

---

[2]The treatment notes from plaintiff's various doctors are often handwritten and difficult to read.  The summaries provided for these handwritten notes, therefore, are based on the most clearly legible notations in these records.

[3]Lumbosacral is defined as pertaining to the triangular bone just below the lumbar vertebrae and the part of the back between the thorax and the pelvis.  Dorland's Illustrated Medical Dictionary ("Dorland's") 961-62, 1479, 1705 (28th ed. 1994); see also Spine-health.com, "Lumbosacral Definition" (August 10, 2016) (defining lumbosacral as "[o]f or relating to or near the small of the back and the back part of the pelvis between the hips"), available at http://www.spine-health.com/glossary/lumbosacral.

Hospital where he was treated with physical therapy, bed rest and traction (Tr. 688-89).

On February 1, 1985, Dr. William Kulak, plaintiff's treating physician from September 20, 1984 through January 25, 1989 (Tr. 676), performed arthroscopic surgery on plaintiff's right knee to address synovitis[4] and chondromalacia[5] of the patella (Tr. 694-95). A typed medical note from May 6, 1985, which is contained in the materials provided by Dr. Kulak, states that "at this point[, plaintiff] is unable to return to full activities. He was able to go back during a remission in Feb[ruary]. Possible return to work within 4-6 w[ee]ks" (Tr. 684). Another report that appears to have been completed on or around May 6, 1985 indicates that plaintiff's diagnosis at that time was chondromalacia of the right patella, synovitis of the right knee, lumbar[6] spasm, and right sacroiliac joint[7] inflamat-ion (Tr. 692). This report indicates that plaintiff "is not

---

[4]Synovitis is the inflamation of a membrane contained in joint cavities; synovitis causes pain, particularly when moving. Dorland's 1645.

[5]Chondromalacia is the "softening of the articular cartilage, most frequently in the patella." Dorland's 321.

[6]The lumbar is the part of the back between the thorax and the pelvis. Dorland's 961.

[7]The sacroiliac joint is the joint between the triangular bone just below the lumbar vertebrae and the superior portion of the hip bone. Dorland's 819, 1479.

capable of working in any capacity at this time" but may be capable of working "in about 6 w[ee]ks" (Tr. 692).

A September 4, 1986 disability report by Dr. Kulak, which he appears to have completed in connection with plaintiff's request for day care services for his children, also indicates that plaintiff had chondromalacia of the right patella, inflamation of the right sacroiliac joint and cervical[8] and lumbosacral spine spasms; this report lists plaintiff's prognosis at the time as "guarded" (Tr. 686).  This report also indicates that plaintiff was taking anti-inflammatory medications (Tr. 686).

A treatment note dated September 29, 1986, which again is contained in the materials provided by Dr. Kulak, notes spasms in plaintiff's left and right lumbosacral area and tenderness along the trapezius[9] with mild spasm; the note also states that plaintiff had refilled a prescription for his anti-inflammatory medication, Indocin (Tr. 685).

A January 25, 1989 note contained in the files provided by Dr. Kulak, which is the last contemporaneous treatment note

---

[8]The cervical spine is the part of the spinal column in the neck.  Dorland's 303.

[9]The trapezius is one of two large flat muscles running from the base of the skull to the middle of the back which support the head and shoulders.  Webster's Second New Riverside University Dictionary 1229 (1994).

provided by Dr. Kulak, states that plaintiff has "[i]ncreasing pain in the [right] side of the lower back & occasionally of the cerv[ical] sp[ine]" and prescribes a soft cervical collar for plaintiff as well as the continuation of Indocin (Tr. 685).  This note also states that plaintiff was suffering from "some degree of trapezial spasm on the [right]" and had pain in his sacroiliac joint (Tr. 685).

The record contains what appears to be a portion of a report dated February 12, 1988 that was completed by Dr. Enrique Ergas.  The report indicates that it was prepared in connection with a "followup visit since that time"[10] (Tr. 641).  In the portion of the report contained in the record, Dr. Ergas wrote that plaintiff suffers from "internal derangement of the lumbo-sacral spine" and "internal derangement of the left knee, with torn lateral meniscus, synovitis, and chondromalacia of the medial femoral condyle[11]" (Tr. 641).  Finally, the report indicates that plaintiff had arthroscopic surgery performed on his left knee some time after the surgery performed on his right knee by Dr. Kulak; specifically, the report states: "S/P arthroscopy

---

[10]There is no indication in the record as to what "that time" means.

[11]The medial femoral condyle is the medial of the two surfaces at the distal end of the femur that articulate with the superior surfaces at the head of the tibia.  Dorland's 367, 998.

of the left knee, with partial lateral meniscectomy,[12] synovec-
tomy[13] and shaving chondroplasty[14] of the medial femoral condyle"
(Tr. 641).  Finally, Dr. Ergas notes that plaintiff's prognosis
at that time was "Guarded" (Tr. 641).

An August 2, 1991 treatment note from the Ryan Center
appears to confirm that plaintiff had a second surgery of some
type in 1986; it states that plaintiff was hospitalized and had
surgery in 1986 for a "torn ligament" (Tr. 305).  Another treat-
ment note from the Ryan Center, dated February 24, 1992, corrobo-
rates that this surgery was on plaintiff's left knee; it states
that plaintiff had surgery on both of his knees, once in 1984 and
once in 1986 (Tr. 313).

The Ryan Center's records further indicate that plain-
tiff suffered from chronic lower back pain and sciatica[15] and
wore a back brace as of June 12, 1990 (Tr. 302).  These records
also show that, in addition to Dr. Kulak's Indocin prescription,

---

[12]A meniscectomy is "an excision of an intra-articular
meniscus, as in the knee joint."  Dorland's 1012.

[13]A synovectomy is an "excision of a synovial membrane, as
of that lining the capsule of the knee joint."  Dorland's 1645.

[14]Chondroplasty is "plastic surgery on cartilage" or the
"repair of lacerated or displaced cartilage."  Dorland's 322.

[15]Sciatica is a syndrome characterized by pain radiating
from the back into the buttock and into the lower extremity along
its posterior or lateral aspect.  Dorland's 1193.

beginning in at least 1994, plaintiff was prescribed various other medications, including Motrin, Flexeril, Toradol, Propulsed and Zantac (Tr. 324, 330, 337, 343-44, 346, 348, 354, 356, 359, 360, 363, 366, 368, 370, 371, 376, 378, 382-84, 516-17, 567, 645).  The record further indicates that at least some of these medications caused stomach distress, resulting in a diagnosis of "[m]arked gastroesophageal reflux disease"[16] on March 29, 1995 (Tr. 371, 399, 570; see also Tr. 323, 330, 570, 1041).  An August 2, 1995 treatment note from the Ryan Center further states that plaintiff had severe stomach pain, had been spitting up blood and had been directed to "avoid all NSAIDs"[17] (Tr. 506; see also Tr. 567).  Finally, as of August 25, 1995, plaintiff "could not tolerate Toradol" (Tr. 567).

In two letters dated August 1 and October 16, 1996, Dr. Theresa Mack of the Ryan Center -- plaintiff's treating physician beginning in June 1995 -- noted that plaintiff had injuries in his neck and lower back, caused by the 1984 motor vehicle acci-

---

[16]"Gastroesophageal reflux disease (GERD) is a chronic digestive disease. GERD occurs when stomach acid or, occasionally, stomach content, flows back into your food pipe (esophagus)."  Mayo Clinic, "GERD" (August 10, 2016), http://www.mayoclinic.org/tests-procedures/hemato-crit/home/ovc-20205459.

[17]NSAIDs are "[n]onsteroidal anti-inflammatory drugs" such as aspirin and other pain relievers.  American Academy of Orthopedic Surgeons, "OrthoInfo" (August 10, 2016), available at http://orthoinfo.aaos.org/topic.cfm?topic=a00284.

dent, including a herniated disc in the lower back (Tr. 516-17).
In these letters, Dr. Mack also wrote that plaintiff was being
treated for gastroesophageal reflux disease, had chronic pain and
was unable to work (Tr. 516-17).  An October 14, 1997 letter by
Dr. Mack repeats these same diagnoses (Tr. 545).  A January 23,
1997 treatment note by Dr. Mack similarly diagnoses plaintiff
with lower back pain, gastroesophageal reflux disease and "per-
sistent c-spine," indicating a cervical spine impairment (Tr.
827-28).

       On September 17, 1999, plaintiff was seen by Dr.
Mardam-Bey of the Ryan Center, who diagnosed a herniated disc in
plaintiff's lower back and prescribed Motrin (Tr. 418).  Simi-
larly, in an October 9, 2000 letter, Dr. Mack noted that plain-
tiff had "excruciating back pain" in his lumbar spine, which
radiated up the spine and down both legs, and stated that he had
a "history of herniated disc since 1986" (Tr. 573).  This letter
also notes that plaintiff could not bathe without assistance from
his wife (Tr. 573).

       Finally, on November 8 and December 22, 2000 and again
on January 25, 2001, plaintiff was given epidural steroid injec-
tions into his lumbar spine to address his back pain (Tr. 605-
36).

2. Treating Source Opinions
   and Consultative Opinions

   a.  Dr. Kulak's Reports

        In a letter dated April 27, 1985, Dr. Kulak noted that
plaintiff had sustained injuries to the lumbosacral spine and
right knee as a result of the accident that occurred on September
18, 1984 (Tr. 691).  Dr. Kulak further noted that, as of the date
of the letter, "a definite partial disability exists in regard to
the right knee and lumbosacral spine" (Tr. 691).  The letter also
notes that plaintiff "ambulated with a cane with difficulty and
pain" (Tr. 689) and that plaintiff's pain had persisted despite
treatment and medication (Tr. 691).  Finally, Dr. Kulak wrote
that plaintiff's prognosis was "guarded" and that plaintiff was
"unable at this point in time to be employed in his prior occupa-
tion as a security guard due to the increased risk to himself and
others, and his inability to perform his occupational activities
to a full capacity" (Tr. 691).

        The record also contains the report which appears to
have been completed on or around May 6, 1985 by Dr. Kulak,[18]

_____

        [18]Although this report does not expressly indicate its
author, it is contained with the files provided by Dr. Kulak in
response to a subpoena issues by SSA on February 5, 1998 (Tr.
675-95).

11

indicating that plaintiff's diagnosis at that time was chondro-
malacia of the right patella, synovitis of the right knee, lumbar
spasms and right sacroiliac joint inflamation (Tr. 692).  This
report states that plaintiff "is not capable of working in any
capacity at this time" but may be capable of working "in about 6
w[ee]ks" when a re-evaluation was scheduled (Tr. 692).  The
report also notes that plaintiff was capable of walking and
sitting to a limited extent, but not climbing; it does not
indicate whether plaintiff needed a cane to walk (Tr. 692).

        In addition, as discussed above, on September 4, 1986,
Dr. Kulak completed a disability report in connection with an
apparent request by plaintiff for day care services for his
children (Tr. 686-87).  In this report, Dr. Kulak noted that
plaintiff was suffering from chondromalacia of the right patella,
inflamation of the right sacroiliac joint and cervical and
lumbosacral spine spasms (Tr. 686).  This report also indicates
that plaintiff was taking anti-inflammatory medications (Tr.
686).  Finally, in response to a question on the form seeking a
projected duration of plaintiff's disability, Dr. Kulak answered
with "?" and further noted that it was "unknown" how long child
care services would be required as a result of plaintiff's
disabilities (Tr. 686).

Lastly, on February 12, 1998, Dr. Kulak provided interrogatory answers regarding his care of plaintiff (Tr. 676-80).  In these responses, Dr. Kulak noted that he treated plaintiff from September 20, 1984 to January 25, 1989, with visits occurring every one to four months (Tr. 676).  Dr. Kulak further wrote that his physical examinations of plaintiff showed that plaintiff suffered from synovitis and chondromalacia of the right knee, cervical and lumbosacral spine spasms, inflamation of the right sacroiliac joint and transient right sciatica (Tr. 676). Dr. Kulak wrote that the onset of plaintiff's condition was the date that he was struck by the motor vehicle -- September 18, 1984 (Tr. 678).  Finally, this report states that, as of plaintiff's last visit on January 25, 1989, plaintiff was incapable of bending but was capable of sitting for four hours in an eight-hour day, standing and walking for between four and six hours in an eight-hour day and lifting and carrying up to 20 pounds for two hours in an eight-hour day (Tr. 680).  Dr. Kulak did not indicate whether plaintiff required a cane to stand or walk.

                    b.  Dr. Ergas'
                        February 1988 Report[19]


          As noted above, Dr. Ergas completed a report on Febru-

ary 12, 1988 that notes that plaintiff had internal derangement

of the left knee, with a torn lateral meniscus, synovitis and

chondromalacia (Tr. 641).  This report also indicates that, some

time prior to the date of the report, arthroscopy of the left

knee was performed "with partial lateral, synovectomy and shaving

chondroplasty of the medial femoral condyle" (Tr. 641).  Plain-

tiff's prognosis is noted as "Guarded" in this report (Tr. 641).


                    c.  Dr. H. Shapiro's Report


          On December 1, 1994, Dr. H. Shapiro reviewed plain-

tiff's file at SSA's request and completed a residual physical

functional capacity assessment (Tr. 487-94).  Dr. Shapiro diag-

nosed plaintiff with back pain and concluded that plaintiff could

occasionally lift and carry 50 pounds, could frequently lift and

carry 25 pounds, could sit, stand and walk for about six hours in

an eight-hour workday and could push or pull for an unlimited

amount of time in an eight-hour workday (Tr. 488).

_____

          [19]Dr. Ergas' report was contained in materials provided by
St. Luke's Roosevelt Hospital Center (Tr. 6).  Further, as
previously discussed, it is unclear whether the record contains
Dr. Ergas' complete report or only a portion of the report.

        d.  Dr. Mack's Reports

        In a letter dated October 16, 1996, Dr. Mack wrote that
plaintiff injured his neck and lower back in a motor vehicle
accident in 1984 (Tr. 516).  Dr. Mack also noted that plaintiff
had a herniated disc in his lower back which had persisted from
1986 to the date of the letter, and had been diagnosed with
gastroesophageal reflux disease (Tr. 516).  Finally, Dr. Mack
wrote that plaintiff was "unable to work" due to his medical
conditions (Tr. 516).

        On February 2, 1998, Dr. Mack completed a medical
questionnaire regarding plaintiff's condition in which she noted
that plaintiff suffered from chronic back pain, a herniated disc
since 1986, a broken shoulder and an ulcer that is aggravated by
the medications used to treat plaintiff's chronic back pain (Tr.
567).  Dr. Mack also wrote that plaintiff was "trampled on at a
public event [in] 1996," causing him to re-injure his back (Tr.
567).  This report also states that plaintiff could not bathe
without assistance from his wife and had cervical spine pain (Tr.
567-68).  Finally, in this report, Dr. Mack diagnosed plaintiff
with a herniated disc and noted that the onset date for plain-
tiff's impairment was 1984 "by history" and that this date was
confirmed by the Ryan Center in 1990 (Tr. 569).  Dr. Mack wrote

                              15

that plaintiff could not sit, stand or walk for more than 30
minutes in an eight hour day, could not lift or carry any objects
and could not bend, squat, climb, grasp or pull (Tr. 572).

Finally, in a brief letter dated October 9, 2000, Dr.
Mack again noted that plaintiff has had a herniated disc since
1986, was being treated for "excruciating back pain (lumbar
spine), which now radiates up the spine and down both legs" and
was incapable of bathing without assistance (Tr. 573).

e.   Dr. Peter Graham's Reports

On November 14, 1994, Dr. Peter Graham examined plain-
tiff at the request of SSA (Tr. 477-86).  In his report, Dr.
Graham noted that plaintiff uses a cane to walk (Tr. 477) and
stated that plaintiff had "a minimal functional deficit" with
respect to his back pain and "no functional deficit" with respect
to his joint pain (Tr. 480).  He concluded his report by giving
plaintiff a "Fair" prognosis and noting that plaintiff was "able
to sit, stand, walk, lift, carry, handle objects, speak and
travel" (Tr. 480).

Dr. Graham re-evaluated plaintiff on December 11, 1996
(Tr. 548-55).  Again, in the report regarding this evaluation,
Dr. Graham noted that plaintiff sometimes used a cane to walk
(Tr. 548).  The report further states that plaintiff had no

16

functional deficit with respect to either his neck, back or joint pains and that plaintiff was "able to sit, stand, walk, lift, carry, handle objects, speak and travel" (Tr. 550).  Finally, Dr. Graham gave plaintiff a prognosis of "Stable" (Tr. 550).

               f.  <u>Dr. K. Seo's Report</u>

On April 22, 1999, Dr. K. Seo examined plaintiff at SSA's request (Tr. 588-90) and concluded that plaintiff's cervical spine and shoulders had a normal range of motion, among other things, but that plaintiff had "[l]ow back derangement" (Tr. 588-89).  Dr. Seo also noted that plaintiff had difficulty standing, sitting and walking for prolonged periods and that he could sit and stand for four hours in an eight-hour workday, "walk a few blocks" and lift and carry "20+" pounds (Tr. 589).

               g.  <u>Dr. John Cordice's Report</u>

Dr. Cordice reviewed plaintiff's file at SSA's request on May 10, 1999 and prepared a residual physical functional capacity assessment (Tr. 580-87).  In his report, Dr. Cordice listed "low back derangement" as the primary diagnosis and concluded that plaintiff could occasionally lift and carry 50 pounds, could frequently lift and carry 25 pounds, could sit, stand and walk for about six hours in an eight-hour workday and

17

could push or pull for an unlimited amount of time per eight-hour workday (Tr. 581).

### h.  Dr. Bernard Gussoff's Report

Dr. Gussoff examined plaintiff at SSA's request on November 27, 2000 (Tr. 595-99).  As part of his examination, Dr. Gussoff reviewed an x-ray of plaintiff's lumbosacral spine (Tr. 597).  In his examination report, Dr. Gussoff noted that plaintiff "has a slight limp on the right and walks with the use of a cane, he cannot walk without the cane" (Tr. 596).  He also noted that plaintiff's muscle strength in his lower extremities "is decreased to 3/5" and that plaintiff had "[a]dvanced herniated disc disease at multiple levels at the lumbosacral spine", "[c]hronic recurrent headaches, cause undetermined", "[j]oint pain" and a stomach ulcer (Tr. 597).  His medical assessment was that plaintiff could "function in sedentary activities.  [However, a]ny attempt to do any prolonged walking, standing, lifting, carrying would probably be beyond his capacity in view of the back problem" (Tr. 598).

### i.  Dr. Shirley Nelson's Report

In a report dated October 17, 2001, Dr. Shirley Nelson of the Ryan Center diagnosed plaintiff with a herniated disc that

18

had persisted since 1986 (Tr. 643).  Dr. Nelson's report states
that plaintiff suffered from chronic back pain and repeats the
conclusions of Dr. Mack's February 1998 report (Tr. 643).
Specifically, Dr. Nelson noted that plaintiff could not sit,
stand or walk for more than 30 minutes in an eight hour day,
could not lift or carry any weight and was unable to bend, squat,
climb, push, pull or grasp (Tr. 647).

### j.  E. Schulman's Report

Finally, in a residual physical functional capacity
assessment that appears to be dated December 19, 2000, SSA
medical consultant E. Schulman reviewed plaintiff's file for the
period from May 1989 to December 19, 2000 (Tr. 648-55).[20]  As
discussed in more detail below, this report indicates that the
purpose of the assessment was for a Stieberger review (Tr. 648).
Schulman concluded that plaintiff could lift 10 pounds occasion-
ally, less than 10 pounds frequently and could sit for about six
hours in an eight-hour day (Tr. 649).  The assessment further
states that a "medically required hand-held assistive device is
required" for plaintiff to walk (Tr. 649).  The assessment notes

---

[20]It is not clear from this report whether Schulman has any
medical training or credentials.  His report does not identify
any medical credentials.

19

that Schulman's findings are based on plaintiff's herniated disc
and severe pain and Dr. Gussoff's finding that plaintiff has
decreased strength in his lower extremities and requires a cane
for walking (Tr. 649).

B.   Procedural Background

1.   Plaintiff's Prior Applications

Plaintiff first applied for social security benefits on
October 17, 1984 (Tr. 181-83).  The administrative record,
however, reveals several ambiguities related to this application.
First, the record does not contain any copy of the application
form itself; rather, the only evidence of this application are
computer print-outs from SSA indicating that an application was
filed on October 17, 1984.  Second, the record is unclear as to
whether plaintiff's 1984 application sought both DIB under Title
II of the Act and supplemental security income ("SSI") benefits
under Title XVI of the Act or just DIB benefits.[21]  Third, and

_____

[21]For example, some of the computerized records concerning
the 1984 application contain the notations "SSI INVOLVED" and
"DIB ONSET," suggesting that plaintiff sought both SSI and DIB
(Tr. 181, 194, 209).  Additionally, Administrative Law Judge
("ALJ") Robin J. Arzt, in her November 17, 2005 decision finding
plaintiff's present application was barred by res judicata,
refers to the 1984 application as an "SSI application" (Tr. 57).
Further, the disability report plaintiff completed in connection
(continued...)

most importantly, the record is unclear as to the disposition of
this application.

Two documents in the record indicate that the applica-
tion was denied on December 17, 1984 under the denial code
"N31"[22] (Tr. 193, 437).  The first of these documents is one of
the computer print-outs mentioned above that notes that plain-
tiff's application was filed on October 17, 1984 (Tr. 193).  The
second appears to be an internal report completed by an SSA
Disability Analyst 1, C. Dibble, on September 3, 1999; this
report indicates that SSA screened plaintiff's 1984 application
to determine if it should be reopened under the Stieberger
settlement (Tr. 437).  Specifically, this report states that "in
order to process a medical review under the Sony/Stieberger class

_____

[21](...continued)
with the present application contains a section that was
completed by the SSA interviewer who met with plaintiff.  That
section states that "NH denied SSI with onset of 10/17/1984 in
12/84"; although it is unclear who or what "NH" is, this appears
to indicate that plaintiff reported to SSA that his October 17,
1984 claim included an application for SSI, which was denied in
December 1984 (Tr. 274).  However, there are also computerized
records from SSA that indicate that the October 17, 1984
application sought DIB only (See Tr. 183, 206).

[22]According to the Social Security Administration's Program
Operations Manual System ("POMS"), a N31 code is a DIB and SSI
denial code for situations in which "[t]he individual has a
severe impairment(s) but is found not disabled because he or she
has the functional and vocational capacity to engage in
substantial gainful activity in relevant past work."  POMS § DI
26510.045(C)(2)(g), available at
https://secure.ssa.gov/apps10/poms.nsf/partlist!OpenView.

action suit, an additional folder search is required for the
following denial dates: 12/17/84 - N31" (Tr. 437).  The record
also contains a document entitled "Stieberger Supplement" that
was completed on October 6, 2000, in which plaintiff described
his alleged disabilities (Tr. 592-94).  Part I of this document
states that plaintiff had made a prior disability claim on
October 1, 1984 that was covered by a "Stieberger
Denial/Termination" (Tr. 592).  Part I of the report further
indicates that the earliest date covered by the disability report
plaintiff filled out for this claim is May 1, 1989.[23]  Finally,
although this report was signed by plaintiff, the report states
that Part I is "For Social Security Administration Completion,"
indicating that SSA provided the information described in the
preceding two sentences (Tr. 592).

        The record includes several other computer print-outs,
however, which indicate that plaintiff's 1984 application was not
received by SSA until October 6, 2004 (Tr. 181, 183, 194, 206,
209), which is also the date on which plaintiff filed the appli-
cation that is the focus of the present litigation (Tr. 174-76,
257-77).

------

        [23]This document does not identify the disability report
being referenced, nor does it explain why May 1, 1989 was
selected as the earliest date covered by the disability report it
references.

Plaintiff re-applied for benefits in 1994, this time seeking only SSI benefits as of October 17, 1994 (Tr. 185, 656-58).  SSA denied plaintiff's 1994 application on December 7, 1994 (Tr. 660-63).  Plaintiff requested reconsideration (Tr. 664), and SSA upheld the denial of plaintiff's application on March 29, 1995 (Tr. 666-69).  On April 12, 1995, plaintiff appealed and requested a hearing before an ALJ (Tr. 670-72).  Plaintiff subsequently waived his right to personally appear at the hearing, and ALJ Herbert Frenkel rendered a decision on the documentary evidence in the record on April 16, 1996 (Tr. 85).  ALJ Frenkel found that plaintiff was not disabled and therefore was not entitled to SSI benefits (Tr. 82-89).  Plaintiff appealed ALJ Frenkel's decision to the Appeals Council on June 14, 1996 (Tr. 90), and, according to computer print-outs in the record, it appears that the Appeals Council issued a decision on November 15, 1996 (Tr. 187-90, 198, 213); however, the nature of that decision is not entirely clear because the record does not contain the notice that was sent to plaintiff advising him of the Appeals Council's decision.  Nonetheless, a later decision on plaintiff's present application states that the Appeals Council affirmed the ALJ's April 16, 1996 decision, indicating that plaintiff's 1994 application was ultimately denied (Tr. 57).

23

Plaintiff re-applied for SSI benefits on November 21, 1996, alleging that his disability began on September 18, 1984[24] (Tr. 171-73).  On January 29, 1997, SSA denied this application (Tr. 91, 94-97).  After SSA's denial was upheld following plaintiff's request for reconsideration (Tr. 100-03), plaintiff requested a hearing before an ALJ (Tr. 104-07).  On February 25, 1998, plaintiff attended a hearing before ALJ Newton Greenberg (Tr. 119-37).  ALJ Greenberg denied plaintiff's application on March 17, 1998 (Tr. 108-16).  Plaintiff appealed the ALJ's decision to the Appeals Council, which upheld the ALJ's determination on March 30, 2000 (Tr. 117-18, 138-40).[25]

Thereafter, on June 5, 2000, plaintiff filed a civil action in this District challenging the denial of his 1996

---

[24]Although plaintiff alleged in this application that he was disabled as of September 1984, unlike DIB, retroactive benefits pre-dating the date of the application for benefits are not available with respect to SSI claims. Feliciano v. Colvin, 12 Civ. 6202 (PGG)(RLE), 2015 WL 1514507 at *19 n.14 (S.D.N.Y. Mar. 31, 2015) (Gardephe, D.J.).  Thus, unless a claimant is alleging a progressive condition, SSA would have no occasion to consider the claimant's condition prior to the date of his application for SSI benefits.

[25]The record also indicates that plaintiff filed another SSI claim at some point in this time period.  Specifically, the record contains a notice of denial of an SSI claim dated May 13, 1999 (Tr. 67-71); however, the record does not contain the actual application to which this denial applies.  In any event, because plaintiff eventually received benefits on his 1996 SSI claim, plaintiff's subsequent 1999 application for SSI has no impact on this case.

Case 1:15-cv-03366-PGG-HBP   Document 30   Filed 08/22/16   Page 25 of 64

application.  Martinez v. Apfel, 00 Civ. 4185 (LTS).  By Stipula-
tion and Order dated October 5, 2000, the parties agreed to
vacate the ALJ's decision and remand the action for additional
proceedings (Tr. 141-42).  The Appeals Council then vacated ALJ
Greenberg's March 17, 1998 decision on February 7, 2001 and
remanded the decision to ALJ Greenberg for further proceedings
(Tr. 143-45).

On December 28, 2001, ALJ Greenberg found that plain-
tiff had the following severe impairments:  "chronic back pain
with radiculopathy, shoulder pain, cervical pain, gastroesophag-
eal reflux, asthma and headaches" (Tr. 59-66).  ALJ Greenberg
further found that plaintiff "has [a] non-exertional impairment,
which result[s] in the inability to perform work at any exertion-
al level" and that plaintiff's "residual functional capacity is
so restricted as to preclude the performance of any sustained
work on a regular basis at any exertional level" (Tr. 65).
Accordingly, ALJ Greenberg found that plaintiff "has been under a
disability, as defined in the Social Security Act, since November
21, 1996" -- i.e., the date of his application (Tr. 65).

2.  The Present Application

On October 6, 2004, plaintiff filed the present appli-
cation seeking DIB as of October 17, 1984 (Tr. 174-76, 257-77,

25

285-91).  The date of the present application is the same date
that, as noted above, certain SSA records indicate plaintiff's
1984 application was "received" (Tr. 181, 183, 194, 206, 209).
Plaintiff states that, "[o]n information and belief, SSA took
this [2004] application as related to the Stieberger claim"
(Plaintiff's Memorandum in Support of His Motion for Judgment on
the Pleadings, dated Jan. 26, 2016 (D.I. 15) ("Pl. Memo"), at
5).[26]

On December 9, 2004, SSA denied plaintiff's claim for
DIB (Tr. 157-58).  On January 20, 2005, plaintiff appealed the
SSA's denial and requested a hearing before an ALJ (Tr. 162-66;
278-84).  Plaintiff attended a hearing before ALJ Robin J. Arzt
on November 1, 2005 (Tr. 914-57).[27]  On November 17, 2005, ALJ
Arzt dismissed plaintiff's application, finding that res judicata
barred plaintiff's claim (Tr. 55-58).  Specifically, the ALJ
found that plaintiff's initial 1984 application had been denied

---

[26]Although both what prompted plaintiff to file this
application nearly 20 years after his first application and why
SSA's records indicate that the 1984 application was not
"received" until 2004 are not entirely clear from the record,
there is a letter from plaintiff's counsel to the Appeals
Council, dated July 31, 2006, in which counsel states that "it
was SSA who contacted [plaintiff] in 2004 regarding his 1984
claim for Title II disability benefits and potential entitlement"
(Tr. 48 (emphasis in original)).

[27]Plaintiff did not bring a cane with him to this hearing
(Tr. 938).

on December 17, 1984 and that the denial of that application, as well as the denial of plaintiff's 1994 SSI application by ALJ Frenkel are "final determinations that the claimant was not disabled . . . during the period from October 17, 1984 . . . through April 16, 1996" (Tr. 57).  ALJ Arzt did not discuss the Stieberger settlement in her decision denying plaintiff's application.

Plaintiff appealed the ALJ's decision to the Appeals Council and, on November 17, 2006, the Appeals Council vacated ALJ Arzt's finding that res judicata barred plaintiff's applications because the standard of review for musculoskeletal impairments in the regulations had been revised in 2002 and directed that the ALJ make a "substantive decision on the issue of disability effective October 17, 1984" (Tr. 45-47).  On August 28, 2007, plaintiff attended another hearing before ALJ Arzt, during which ALJ Arzt noted that plaintiff now claimed an alleged onset date of September 18, 1984 (Tr. 958-86; see also Tr. 30).

On August 30, 2007, ALJ Arzt issued a decision finding that plaintiff's DLI was December 31, 1986 based on his work history and that plaintiff was not under a disability as defined by the Act from September 18, 1984 through December 31, 1986 and

27

that plaintiff retained the capacity for light work[28] (Tr. 27-
38).  Plaintiff appealed the ALJ's decision to the Appeals
Council, which denied review on August 5, 2009 (Tr. 13-17).  On
November 13, 2009, plaintiff filed a civil action challenging the
ALJ's determination.  Martinez v. Astrue, 09 Civ. 9451 (NRB).  By
Stipulation and Order dated January 5, 2010, the parties agreed
to vacate the ALJ's August 30, 2007 decision and remand for
further proceedings (Tr. 1021-22).  On December 22, 2010, the
Appeals Council remanded the case to ALJ Mark Solomon and di-
rected the ALJ to re-evaluate the opinions of plaintiff's treat-
ing physician, Dr. Kulak, to give further consideration to
plaintiff's maximum residual functional capacity and to obtain
evidence from a vocational expert "to clarify the effect the

─────────────

[28]Light work is defined by 20 C.F.R. §§ 404.1567(b),
416.967(b) as follows:

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, you must have the ability to do
> substantially all of these activities.  If someone can
> do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to
> sit for long periods of time.

assessed limitations have on claimant's occupational base"[29] (Tr. 1016-20).

A hearing was held before ALJ Solomon on March 29, 2011, during which the Stieberger settlement appears to have been discussed because the ALJ stated, after a discussion off the record, that "for the purposes of this hearing, the date of last insured is some time in May of 1989" (Tr. 1036, see also Tr. 1033-60).  On April 29, 2011, ALJ Solomon issued a decision denying plaintiff's claim for relief.  In his decision, ALJ Solomon found that plaintiff was entitled to a DLI of December 31, 1989 "due to the Steinberger [sic] litigation" but that plaintiff was not disabled from October 17, 1984 through December 31, 1989 (Tr. 987-97).  Specifically, ALJ Solomon found that, through the date last insured, plaintiff had severe impairments in the form of lumbar disc disease and a right knee disorder but rejected plaintiff's argument that he also suffered from shoulder, cervical spine and left knee impairments (Tr. 992-94).  ALJ Solomon also concluded that, during the period from October 1984

---

[29]In the remand order, the Appeals Council notes that ALJ Arzt, in making her decision, partially relied on a "September 1986 report" completed by Dr. Kulak (Tr. 1019).  The remand order further states that this September 1986 report -- which, from the administrative record, appears to be the September 4, 1986 report completed by Dr. Kulak (Tr. 686-87) -- "could not be located in the record" and directs the ALJ to obtain a copy of this record, if possible (Tr. 1019).

through December 31, 1989, plaintiff retained the capacity to stand and walk for six hours in an eight hour day, to sit for four hours in an eight hour day and to lift and carry up to ten pounds occasionally and five pounds frequently; based on these findings, ALJ Solomon concluded that "plaintiff had the residual functional capacity to perform a range of work between sedentary[30] and light work" (Tr. 993).  Finally, ALJ Solomon concluded that plaintiff's use of a cane was not medically necessary (Tr. 994-95).[31]

On August 26, 2011, plaintiff filed a civil action challenging ALJ Solomon's April 29, 2011 decision.  Martinez v. Astrue, 11 Civ. 6013 (RA)(HBP).  By Stipulation and Order dated

---

[30]Under the regulations, "sedentary work" is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

[31]In his decision, ALJ Solomon also discussed the "September 1986 report" that the Appeals Council directed him to locate and stated that the record did not contain a September 1986 report (Tr. 995).  Again, the record indicates that the report being referenced by ALJ Solomon is the disability form Dr. Kulak completed on September 4, 1986 (Tr. 686-87).

August 17, 2012, the parties agreed to remand this case for
additional proceedings.  <u>Martinez v. Astrue</u>, 11 Civ. 6013
(RA)(HBP), D.I. 16 (S.D.N.Y. Aug. 17, 2012) (Abrams, D.J.).  On
November 27, 2012, the Appeals Council vacated the April 29, 2011
decision and directed the ALJ to (1) determine plaintiff's DLI
and whether plaintiff's present application qualifies plaintiff
for relief under the <u>Stieberger</u> settlement[32]; (2) address whether
plaintiff's alleged left knee and cervical spine impairments
qualify as medically determinable impairments within the meaning
of 20 C.F.R. §§ 404.1508, 404.1520; (3) if warranted, give
further consideration to the treating source opinion of Dr. Kulak
and explain the weight given to such opinion evidence; (4) if
warranted, give further consideration to plaintiff's maximum
residual functional capacity and (5) obtain supplemental evidence
from a vocational expert as warranted by the expanded record (Tr.
1096-97).

On April 17, 2013, plaintiff appeared for a second
hearing before ALJ Solomon (Tr. 1122-47).  During the hearing,
ALJ Solomon took testimony from Dr. Gerald Belchick, a vocational

---

[32]The Appeals Council also noted, with respect to
<u>Stieberger</u>, that "it is unclear how December 31, 1989 was
selected as the claimant's date last insured in the [April 2011]
hearing decision . . . .  During the claimant's March 29, 2011
hearing, it appears to have been concluded that the claimant's
date last insured was May of 1989" (Tr. 1095).

expert (Tr. 1134-44).  On May 7, 2013, ALJ Solomon denied plain-
tiff's application (Tr. 1067-78).  At the outset of the decision,
ALJ Solomon found that plaintiff is entitled to a DLI of December
31, 1986 and is not a Stieberger class member because "[plain-
tiff's] 1984 application for Title II benefits was not received
and acted upon until October 2004 as shown in the original notice
disapproving claimant's claim" and, accordingly, there was no
final denial or ALJ action on plaintiff's application within the
time frame required for inclusion in the Stieberger class (Tr.
1071, citing Tr. 93, 157-61).  In making this determination, ALJ
Solomon relied on a statement made by plaintiff's counsel during
the November 1, 2005 hearing before ALJ Arzt that SSA called
plaintiff in June of 2004 and told him "that the application from
1984 was never processed" (Tr. 1071, citing Tr. 930).  ALJ
Solomon also noted that,

> [as] a practical matter, neither the application of the
> original date last insured of December 31, 1986 or the
> date last insured adjusted under Stieberger previously
> (December, 31, 1989) would change the outcome of this
> decision because 1) I am not finding the claimant
> disabled at any point prior to either of these dates
> last insured, 2) the alleged onset date is October 17,
> 1984 which (if I were to find the claimant disabled)
> would be prior to the earliest date last insured of
> December 31, 1986.  Therefore, this is a moot point.
> Nonetheless, I have addressed the issue as directed by
> the Appeals Council.

(Tr. 1070).[33]

ALJ Solomon's decision went on to find that plaintiff had the severe impairments of lumbar disc disease and right knee impairment prior to the December 31, 1996 but that "the medical record does not contain diagnostic tests confirming left knee o[r] cervical impairments and therefore I can find no medically determinable impairment . . . in accordance with the regulations of Social Security Administration" (Tr. 1073).  ALJ Solomon further noted that, even if he were to find impairments of the left knee and cervical spine, "they would not have any bearing on the outcome of this case" because his findings as to plaintiff's residual functional capacity was based on the opinion of Dr. Kulak, who considered all of the conditions for which he was treating plaintiff, as well as any limitations plaintiff had at that time, when assessing plaintiff's capabilities (Tr. 1073).

With respect to plaintiff's residual functional capac- ity, ALJ Solomon concluded that plaintiff could sit for up to

---

[33]There is no indication in the record that the ALJ considered any of the documents in the record indicating plaintiff's 1984 application was denied on December 17, 1984 with an N31 denial code.  Additionally, as was the case in his prior decision, ALJ Solomon notes that he could not locate any September 1986 report by Dr. Kulak (Tr. 1075).  Again, the record indicates that the report being referenced by ALJ Solomon is the disability form that Dr. Kulak completed on September 4, 1986 (Tr. 686-87).

four hours in an eight-hour day, stand for up to six hours in an eight-hour day, lift and carry 20 pounds for up to two hours but that plaintiff could not climb ropes, ladders or scaffolds (Tr. 1073-74).  ALJ Solomon further found that there was insufficient evidence to conclude that plaintiff's use of a cane was medically necessary prior to either December 31, 1986 or December 31, 1989 because (1) "the records do not indicate that claimant needed a cane all the time" and (2) plaintiff did not have a cane with him in two of his prior hearings before ALJs (Tr. 1074-75).  In making these determinations, the ALJ accorded "significant weight" to the findings of Dr. Kulak, "substantial weight" to the findings of the doctors at the Ryan Center, "some weight" to Dr. Graham and Dr. Seo's findings and "minor weight" to Dr. Gussoff's findings (Tr. 1074-76).  There is no indication that ALJ Solomon considered Schulman's report or Dr. Ergas' report in making his decision.

Finally, the ALJ concluded, on the basis of the vocational expert's testimony, that plaintiff was not disabled and could return to his prior work as a security guard at a parking garage and that, through the DLI, plaintiff could perform certain occupations categorized as light work, including as a "Cleaner," with 6,000 jobs in the local economy, an "Office Helper," with

34

3,400 jobs in the local economy and as a "Warehouse Worker," with 1,700 jobs in the local economy (Tr. 1077).

Plaintiff appealed to the Appeals Council, which upheld ALJ Solomon's decision on February 27, 2015 (Tr. 1061-66). Plaintiff commenced this action on April 30, 2015 (Complaint, dated Apr. 30, 2015 (D.I. 1)).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court "may not 'affirm an administrative action on grounds different from those considered by the agency.'"  <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015), <u>quoting</u> <u>Burgess v. Astrue</u>, <u>supra</u>, 537 F.3d at 128.

35

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions are supported by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citation omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were

36

supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

      2. Stieberger Review

      In Stieberger v. Sullivan, supra, 792 F. Supp. 1376, as amended in Stieberger v. Sullivan, 801 F. Supp. 1079, the Department of Health and Human Services entered into a settlement designed to correct the Department's systemic policy in the 1980s of refusing to follow controlling judicial precedents concerning eligibility for disability benefits.

> [T]he Stieberger action, brought in 1984, challenged the Secretary of Health and Human Services' policy and practice of nonacquiescence in decisions of the United States Court of Appeals for the Second Circuit. Plaintiffs claimed, inter alia, that the Secretary failed to require SSA adjudicators to apply binding interpretations of law issued by the Court of Appeals to claims of New York State residents for disability benefits under Titles II and XVI of the Social Security Act. The settlement agreement, approved by this Court in Stieberger v. Sullivan, 792 F. Supp. 1376 (S.D.N.Y. 1992), as amended in Stieberger, 801 F. Supp. at 1079, established procedures to ensure that SSA adjudicators follow and apply Second Circuit disability decisions in the future and rectify past misapplications of law. The settlement defines the class entitled to reopen and readjudicate claims and stipulates procedures for identifying, screening, reopening, and readjudicating

such cases.  Specifically, the <u>Stieberger</u> settlement
provides for reopening of individuals' SSA claims who:

> (a) . . . had a disability claim denied or termi-
> nated between October 1, 1981, and July 2, 1992,
> on the ground that the person was not or was no
> longer disabled (grounds for denial or termination
> other than disability, <u>e</u>.<u>q</u>., excess resources,
> were excluded,);
>
> (b) was a New York state resident at the time of
> the denial or termination;
>
> (c) had a disability claim denied or terminated,
>
> > (i) at any level of administrative review
> > between October 1, 1981, and October 17,
> > 1985, inclusive; or (ii) at the Administra-
> > tive Law Judge or Appeals Council level be-
> > tween October 18, 1985 and July 2, 1992.

<u>Stieberger v. Commissioner of Social Security</u>, 188 F. Supp. 2d

424, 426 (S.D.N.Y. 2002) (Sand, D.J.), <u>quoting</u> <u>Stieberger v.</u>

<u>Sullivan</u>, <u>supra</u>, 801 F. Supp at 1086.  The <u>Stieberger</u> settlement

agreement is effective for eight years -- <u>i</u>.<u>e</u>., until June 19,

2000; however any obligations to take action incurred during the

pendency of the agreement continue after that eight-year period.

Hearings, Appeals and Litigation Law Manual ("HALLEX")[34] §

I-5-4-13(II), <u>available</u> <u>at</u> https://www.socialsecurity.gov-

/OP_Home/hallex/I-05/I-5-4-13.html.  The <u>Stieberger</u> settlement

---

[34]"The Hearings, Appeals and Litigation Law Manual . . .
provisions were created to guide implementation of the <u>Stieberger</u>
settlement." <u>Nolfi v. Astrue</u>, No. 10-CV-349-A, 2011 WL 3475852,
at *3 n.6 (W.D.N.Y. Aug. 9, 2011).

expressly provides that the District Court retains jurisdiction to enforce the settlement. Stieberger v. Sullivan, supra, 801 F. Supp. at 1095.

Pursuant to the Stieberger settlement, beginning on March 8, 1993, the SSA Central Office sent notices to potential class members. Those potential class members had 180 days from receipt of the notice to request a reopening of their prior claim. The settlement also provides that any potential class member may independently request the reopening of any prior claim in writing, by telephone or in person, and SSA is required to acknowledge the request in writing. HALLEX § I-5-4-13(VI)(A).

Once a request for reopening is received, SSA screens the application to determine if it is entitled to reopening. HALLEX § I-5-4-13(VII). If the claimant is determined not to be a class member, SSA is required to "notify the individual, and representative, if any, of the determination that he or she is not entitled to relief as a class member and [to] furnish a copy of the dated notice [sent to the claimant] to the Office of the General Counsel." HALLEX § I-5-4-13(VII)(B)(1). If the claimant is determined to be a class member, SSA will begin processing and readjudicating his or her claim. HALLEX §§ I-5-4-13(VII)(B)(2), (VIII).

When a non-pending claim, such as plaintiff's, is reopened under <u>Stieberger</u>, the SSA must develop the administrative record pursuant to 20 C.F.R. §§ 404.1512-.1518, 416.912-.918 for the "Development Period" to determine disability status. <u>Nolfi v. Astrue</u>, <u>supra</u>, 2011 WL 3475852 at *3.   "The Development Period usually begins four years preceding the date SSA receives a class member's request for reopening and continues to the present date unless the class member was found disabled during a subsequent application."   <u>Nolfi v. Astrue</u>, <u>supra</u>, 2011 WL 3475852 at *3; <u>see</u> <u>also</u> HALLEX I-5-4-13(VIII)(B)(1)-(3).[35]

---

[35]Within SSA's management structure, the Development Period is calculated by the SSA Field Office and the record is developed by a department called Disability Determination Services ("DDS"). There are two instances in which DDS will develop the record for the entire retroactive period instead of just the four-year period preceding the plaintiff's request for reopening:  (1) if the four-year period extends back to the alleged disability onset date in the earliest Title II claim; or (2) an exception pursuant to section 10(e)(5) of the settlement agreement applies.  <u>See</u> POMS DI § 42586.055(D)(1).  Under section 10(e)(5), DDS must develop the record back to the earliest retroactive date if DDS determines the class member was not disabled during all or part of the Development Period and one of the following conditions is corroborated:  (i) a class member had a chronic impairment and alleges it was more severe in the past, and more information is needed about any earlier acute phase; or (ii) the class member's treating source during the Development Period differed from the individual's treating source prior to the Development Period, and other evidence may be available.  <u>Nolfi v. Astrue</u>, <u>supra</u>, 2011 WL 3475852 at *4.

If the 10(e)(5) exception is met, DDS will ask the Field Office to obtain the <u>Stieberger</u> claim file and verify the class
(continued...)

40

Finally, the Stieberger settlement contains unique
provisions governing insured status for Title II applications.
Typically, to receive DIB pursuant to a Title II application, a
claimant must have insured status in the first month the claimant
is disabled.  See 20 C.F.R. § 404.101.  A claimant's insured
status is determined based on whether the claimant acquired
sufficient quarters of coverage and the wages the claimant was
paid.  20 C.F.R. § 404.101.

> An applicant must be insured for disability insurance
> benefits to be eligible for [DIB] benefits.  42 U.S.C.
> § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.101(a),
> 404.110 to 404.130, 404.130 to 404.133; Arnone v.
> Bowen, 882 F.2d 34, 37 (2d Cir. 1989).  This translates
> into two requirements:  the applicant must have 1)
> adequate social security earnings to be "fully in-
> sured," 20 C.F.R. § 404.110 through § 404.115; and 2)
> "disability insured status" in the quarter he became
> disabled or in a later quarter in which he was dis-
> abled, [20] C.F.R. § 404.131(a).

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

Pursuant to the Stieberger settlement, however, once a
claimant is found disabled, his or her payments are generally
limited to a 48 month period from December 1, 1987 through
November 30, 1991 ("Payment Period"), except that benefits will

---

[35](...continued)
member's DLI.  See HALLEX I-5-4-13(VIII)(B)(4); POMS DI §
12586.045(B).  However, if the 10(e)(5) conditions are not met,
the record does not need to be developed for an earlier period.
See POMS DI § 42586.055(D) (1)-(2).

be continued after November 30, 1991 if the class member contin-
ues to meet SSA's disability entitlement and eligibility crite-
ria.  HALLEX § I-5-4-13(VIII)(D).  When computing the Payment
Period, the SSA Field Office will assign an administrative onset
date to allow payment during the first month of the Payment
Period.  See HALLEX § I-5-4-13(VIII)(E); POMS DI § 12586.045(A).
Because this onset date is an administrative date, it will not
necessarily be related to the Development Period.  See POMS DI §
12586.045(A).  For Title II DIB cases, the administrative onset
date is usually "the first day of the fifth month before the
first month of the PAYMENT PERIOD."  See POMS DI § 42586.065(D).

     Under the settlement, a Stieberger claimant is presumed
insured as of the administrative onset date as long as the
claimant was insured as of the alleged onset date in the initial
Stieberger claim.  See HALLEX § I-5-4-13 (VIII)(F).  However, in
cases where an actual onset date is established, the presumption
of insured status does not apply and, for entitlement to DIB, the
claimant's actual onset date must be prior to his DLI.  HALLEX §
I-5-4-13(VIII)(E)-(F).

B.  Application

     Given the parties' agreement that the ALJ's determina-
tion was flawed and that plaintiff is entitled to at least some

42

benefits on his present claim, the principal issues presented by this appeal are (1) whether plaintiff's 1984 application was denied in December of 1984 such that plaintiff qualifies as a Stieberger class member and (2) whether the court should make a de novo finding as to whether plaintiff is disabled and the onset date of plaintiff's disability or whether the matter must be remanded for a determination on those issues.

### 1.  Stieberger Settlement

In his May 13, 2013 decision, ALJ Solomon determined that plaintiff is not a Stieberger class member because "[plaintiff's] 1984 application for Title II benefits was not received and acted upon until October 2004 as shown in the original notice disapproving claimant's claim" and, accordingly, that there was no final denial or ALJ action on plaintiff's application within the time frame required for inclusion in the Stieberger class (Tr. 1071, citing Tr. 93, 157-61).  In making this determination, ALJ Solomon relied, in part, on plaintiff's counsel's statement during the November 1, 2005 hearing before ALJ Arzt that SSA called plaintiff in June of 2004 and told him "that the application from 1984 was never processed" (Tr. 1071, citing Tr. 930). ALJ Solomon also relied on those SSA records that indicate that plaintiff's application was not received until October 6, 2004

(Tr. 1071).   ALJ Solomon did not, however, address the "N31" code listed in those records indicating plaintiff's application was denied on December 17, 1984 or whether the record contained any evidence indicating whether plaintiff had requested reopening.

Plaintiff argues that ALJ Solomon's determination that plaintiff's 1984 application was never adjudicated was erroneous and that plaintiff qualifies as a <u>Stieberger</u> class member on the basis of his 1984 application (Pl. Memo, at 20).   Specifically, plaintiff argues that the "N31" code listed in various documents in the record concerning the 1984 application demonstrates that plaintiff's application was denied on December 17, 1984.   Plaintiff further argues that, if he is deemed a <u>Stieberger</u> member, he is entitled to a DLI of December 31, 1989 (Pl. Memo, at 20). Plaintiff does not, however, explain why December 31, 1989 is the correct DLI date.

On the other hand, defendant argues that plaintiff is not a <u>Stieberger</u> class member.   Defendant's arguments, however, are somewhat confusing.   Defendant first appears to argue that plaintiff's 1984 application sought both DIB and SSI,[36] and that one of the computer print-outs reflecting that plaintiff's

---

[36]As discussed in section II.B.1, <u>supra</u>, the record is unclear as to whether plaintiff's 1984 application sought both SSI and DIB benefits, or DIB benefits only.

application was denied on December 17, 1984 is actually evidence that the SSI prong of plaintiff's 1984 application was denied in 1984 but that the DIB application was never addressed (Def. Reply, at 2, citing Tr. 193).  Defendant provides no further support for this theory, and the document defendant cites does not clearly indicate that the December 17, 1984 denial concerned only an SSI application.  Additionally, defendant does not otherwise address the "N31" code in his motion papers.

Defendant's second argument is that plaintiff cannot qualify as a Stieberger class member because his 1994 SSI appli-cation, which was denied and is now final, determined that plaintiff was not disabled (Defs. Reply, at 2-3).  Defendant offers no support for this argument other than citing to the provision of the Code of Federal Regulations that explains that an Appeals Council decision or denial of review is final unless the Appeals Council revises the decision or a civil action is filed in federal district court within 60 days after receiving notice of the Appeals Council's decision.  20 C.F.R. § 416.1481.

On balance, plaintiff's arguments are more compelling than defendant's.  First, with respect to defendant's argument concerning plaintiff's 1994 application, while it is true that (1) a Stieberger class member is not entitled to reopening where a subsequent DIB claim is filed after July 2, 1992 and a final

45

determination or decision is made finding the claimant not
disabled as of the DLI and (2) a claim is not entitled to reopen-
ing where there is a subsequent claim decided after July 2, 1992
that covered the same issues and time period at issue in the
prior Stieberger claim, HALLEX § I-5-4-13(V)(B), neither of these
circumstances apply here.  As noted previously, plaintiff's 1994
and 1996 applications sought SSI only, not DIB.  In addition,
neither of these applications dealt with the same issues and time
period as the 1984 application.  With respect to the 1994 appli-
cation, that application claimed a disability onset date of
October 17, 1994 (Tr. 656), and the April 16, 1996 decision by
ALJ Frenkel on that claim found that plaintiff "was not under a
'disability' as defined by the Social Security Act, at any time
through the date of this decision" (Tr. 88).  Accordingly, the
fairest reading of the ALJ's decision is that the ALJ considered
only the time period from October 17, 1994 through April 16, 1996
-- a different time period than that which would be involved in a
Stieberger review of the 1984 application.  With respect to the
1996 application, although the application claimed a disability
onset of September 18, 1994, the ultimate decision finding
plaintiff disabled merely states that plaintiff was disabled
"since November 21, 1996" -- i.e., the date of his application;
there is no indication that the ALJ determined whether or not

46

plaintiff was disabled before November 21, 1996.  Lastly, because
retroactive benefits are not available on SSI claims, Feliciano
v. Colvin, supra, 2015 WL 1514507 at *19 n.14, there was no
reason in either case for the ALJs to determine whether plaintiff
was disabled prior to the application dates.

     Second, ALJ Solomon's conclusion that there was no
final decision on plaintiff's application because SSA records
show that the application was not received until October, 2004 is
contradicted by those documents in the record, unaddressed by ALJ
Solomon, that show that SSA took some action with respect to
plaintiff's 1984 claim, and even appeared to consider it a possi-
ble Stieberger claim, well before October 4, 2004.  These docu-
ments include the report completed by the SSA Disability Analyst
1 on September 3, 1999, which indicates that plaintiff's initial
claim was denied on December 17, 1984 on the basis of a "N31"
code and that SSA screened plaintiff's 1984 application to deter-
mine if it should be reopened under the Stieberger settlement
(Tr. 437); the "Stieberger Supplement" completed by plaintiff on
October 6, 2000, in which plaintiff notes that he initially filed
a claim in 1984 (Tr. 592-94); Schulman's residual physical func-
tional capacity assessment from 2001 which mentions "Stieberger"
(Tr. 648-55) and the disability report plaintiff completed in
connection with the present claim, which indicates that plaintiff

47

reported he had his October 17, 1984 claim denied in December
1984 (Tr. 274).  The "Stieberger Supplement" is especially note-
worthy because, under the Stieberger settlement, the "final
action [SSA takes] in contacting a class member" is having the
SSA Field Office "obtain the claimant's responses to the ques-
tions on a 'Stieberger Supplement,' i.e., a form created to
gather additional information needed to review Stieberger
claims."  HALLEX § I-5-4-13(VIII)(A).  Moreover, SSA's Temporary
Instruction regarding Stieberger indicates that a "Stieberger
Supplement" is only completed after SSA has already determined
that an individual is a Stieberger class member entitled to
reopening and SSA is processing the class member's claim.  HALLEX
§§ I-5-4-13(VII)(B)(2), (VIII)(A).

        Third, defendant's argument that plaintiff's 1984
application for SSI was denied but his DIB claim was not ad-
dressed is not supported by the document cited by plaintiff,
which indicates only that the application was denied on the basis
of a N31 code (Tr. 193).  As noted in footnote 22, supra, a N31
code is a denial code for both DIB and SSI application where
"[t]he individual has a severe impairment(s) but is found not
disabled because he or she has the functional and vocational
capacity to engage in substantial gainful activity in relevant

past work." POMS § DI 26510.045(C)(2)(g). Assuming the N31 code does denote that plaintiff' 1984 application DIB was denied, it appears that plaintiff would be able to establish each of the criteria for inclusion in the Stieberger settlement, namely that plaintiff (a) had a disability claim finally denied or terminated between October 1, 1981 and July 2, 1992 on the ground that he was not or was no longer disabled; (b) was a New York state resident at the time of the denial or termination and (c) had a disability claim denied or terminated at any level of administrative review between October 1, 1981, and October 17, 1985. HALLEX § I-5-4-13(V)(B).

The law clearly requires that the matter be remanded for further findings of fact on this issue. As an initial matter, the record is unclear as to what exact date, if ever, SSA contacted plaintiff regarding his claim and what exact date, if ever, plaintiff requested reopening. Such facts are generally necessary for a determination of plaintiff's Development Period. HALLEX § I-5-4-13(VIII)(B)(2). The district court, however, has no fact-finding role in its review of social security disability cases and where the record lacks substantial evidence supporting the Commissioner's determination, the matter must be remanded to the Commissioner for further factual findings or development of the record. See Grant v. Shalala, 989 F.2d 1332, 1338 (3rd Cir.

1993) (Alito, then Cir. J.) ("Section 205(g) creates a scheme in which a district court may conduct a restricted review of the Secretary's findings and may remand a case for new findings, but this scheme makes no provision for a district court to make any findings of its own."); see also Michaels v. Colvin, 621 F. App'x 35, 39-40 (2d Cir. 2015) (summary order); Radford v. Colvin, 734 F.3d 288, 296 (4th Cir. 2013); Bryant v. Social Sec. Admin., 478 F. App'x 644, 645 (11th Cir. 2012) (per curiam); Symonds v. Astrue, 448 F. App'x 10, 11 (11th Cir. 2011) (per curiam); Caldwell v. Barnhart, 85 F. App'x 811, 813 (3d Cir. 2003); Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

Here, the ALJ's conclusion that plaintiff is not a Stieberger class member is not supported by substantial evidence, for the reasons discussed above, and fails to address several of the documents relevant to that determination. Kohler v. Astrue, 546 F.3d 260, 269 (2d Cir. 2008) (Sotomayor, the Cir. J.) ("We have remanded in . . . cases where the ALJ has . . . failed to consider relevant probative evidence."), citing Lopez v. Sec'y of Health & Human Servs., 728 F.2d 148, 150-51 (2d Cir. 1984). Accordingly, I recommend that the matter be remanded for further administrative proceedings to determine whether plaintiff is a member of the Stieberger settlement entitled to reopening of his 1984 application.

Additionally, I note that, although unaddressed in his motion papers, plaintiff's complaint characterizes his 1984 claim as seeking both SSI and DIB benefits (Complaint, dated Apr. 30, 2015 (D.I. 1), ¶ 1).  Further, as noted above, defendant appears to agree that plaintiff's 1984 application sought both SSI and DIB (Def. Reply, at 2).  However, as discussed previously, this issue is far from clear.  I therefore further recommend that, on remand, the Commissioner also address whether plaintiff's 1984 application sought SSI as well as DIB benefits and, if it did, whether that SSI application is entitled to reopening under Stieberger.

### 2.   Plaintiff's Disability

In addition to his Stieberger claim, plaintiff also seeks reversal of the ALJ's determination that he was not disabled before either December 31, 1986 or December 31, 1989[37] (Pl. Memo, at 20-25).  Specifically, plaintiff argues that he should be found disabled as of September 18, 1984, but at least no later

---

[37]Although ALJ Solomon found plaintiff was entitled to a DLI of December 31, 1986 and not December 31, 1989, he also stated that "the application of . . . the date last insured adjusted under Steiberger [sic] previously (December, 31, 1989) would [not] change the outcome of this decision because . . . I am not finding the claimant disabled at any point prior to [that date]" (Tr. 1070).

than December 31, 1989, because ALJ Solomon improperly failed to consider evidence of a left knee derangement, evidence of a cervical spine disease and evidence that plaintiff required a cane for walking (Pl. Memo, at 20-21).  Plaintiff also argues that ALJ Solomon improperly failed to consider the medications plaintiff was taking for his pain and the adverse side effects caused by those medications (Pl. Memo, at 24-25).

Defendant does not directly respond to plaintiff's arguments concerning the ALJ's disability determination.  Rather, defendant acknowledges that "the Commissioner did not apply the correct legal standard when determining plaintiff's 2004 DIB claim and his eligibility for this benefit, and we do not contest that plaintiff was eligible for at least a portion of the period he alleges" (Def. Memo, at 5).  Defendant further avers that,

> [w]hile the agency has not yet undertaken a review concerning the calculation of plaintiff's DIB, the agency currently is contemplating, but has not conclusively determined, that a favorable decision should be issued finding plaintiff disabled, for the purposes of DIB, consistent with the onset of disability determined in plaintiff's 1996 SSI application, i.e., as of November 21, 1996.

(Def. Memo, at 5).  Defendant does not explain why SSA believes plaintiff's disability onset date for his DIB claim should be the date of his 1996 SSI application.  More importantly, defendant offers no explanation as to how plaintiff can be eligible for DIB

benefits if plaintiff's disability onset date is after plain-
tiff's DLI, as it would appear to be if defendant determines an
onset date of November 21, 1996 and prevails on the argument that
plaintiff is not a Stieberger class member.   Despite these incon-
sistencies, defendant seeks a remand pursuant to 42 U.S.C. §
405(g) "solely for the purpose of calculating plaintiff's DIB"
(Def. Memo, at 5).

        Although defendant's representations concerning its
admission that plaintiff is owed some benefits are somewhat
confusing, because I recommend remand for a factual determination
on the Stieberger issue, I conclude that remand is also warranted
for a factual finding concerning the extent of plaintiff's dis-
ability and the applicable onset date of plaintiff's disability.
See Grant v. Shalala, supra, 989 F.2d at 1338.   In cases where
the administrative record does not provide "persuasive evidence"
of disability, remand for further proceedings is appropriate.
See Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 1999).   In addi-
tion, "[t]he determination of the date of onset of disability is
a fact-driven inquiry, and the act of weighing evidence in Social
Security cases properly lies in the domain on the Commissioner,
not this Court." McCarthy v. Astrue, 07 Civ. 0300 (JCF), 2007 WL
4444976 at *9 (S.D.N.Y. Dec. 18, 2007) (Francis, M.J.); see also
Morgan v. Sullivan, 945 F.2d 1079, 1082-83 (9th Cir. 1991) (re-

manding for development of evidence regarding onset date of claimant's disability where record was ambiguous).

Accordingly, to the extent plaintiff is seeking a factual determination by this Court that he was disabled as of any particular date, his motion should be denied and the matter remanded for further administrative proceedings.  McCarthy v. Astrue, supra, 2007 WL 4444976 at *9 (remanding even where the district court "expect[ed] the decision to be more favorable to the plaintiff after the law is properly applied" because the court was "unable to identify with certainty the date of onset of [plaintiff]'s disability").[38]

Although I conclude that the matter should be remanded for further proceedings, in an effort to minimize the chance of a subsequent appeal, I make note of the following legal principles.

In light of the non-adversarial nature of a benefits proceeding, an ALJ must affirmatively develop the record to assess all facts relevant to a plaintiff's claim of disability. Pratts v. Chater, supra, 94 F.3d at 37.  The ALJ's duty to de- velop the record extends to facts concerning the onset date of a claimed disability.  Social Security Ruling ("SSR") 83-20, 1983

---

[38]In the event plaintiff is determined to be a Stieberger class member, SSA may not need to determine the actual onset date but instead an administrative onset date.  See HALLEX § I-5-4-13(VIII)(E).

WL 31249 (1983) at *3 (S.S.A. 1983) (if the plaintiff's alleged onset date is not consistent with the evidence in the record "additional development may be needed to reconcile the discrepancy").  Pursuant to the guidelines set forth in SSR 83-20, which are binding on SSA adjudicators, Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984), the ALJ's determination of the onset date must be consistent with the medical evidence, and the ALJ must provide a "[c]onvincing rationale . . . for the date selected." SSR 83-20, 1983 WL 31249 at *3.  Where precise evidence is not available, the ALJ may "infer" the onset date, but that "judgment . . . must have a legitimate medical basis."  SSR 83-20, 1983 WL 31249 at *3.

When the onset date is a matter of inference, the ALJ "should call on the services of a medical advisor" at the hearing, should secure any additional medical evidence that may be available and may seek testimony from lay witnesses.  SSR 83-20, 1983 WL 31249 at *3; accord Plumley v. Astrue, CIV.A. 2:09-CV-42, 2010 WL 520271 at *5-*14 (D. Vt. Feb. 9, 2010); McCall v. Astrue, 05 Civ. 2042 (GEL), 2008 WL 5378121 at *16-*18 (S.D.N.Y. Dec. 23, 2008) (Lynch, then D.J., now Cir. J.); Telfair v. Astrue, 04 Civ. 2122 (JGK), 2007 WL 1522616 at *6-*7 (S.D.N.Y. May 15, 2007) (Koeltl, D.J.); Felicie v. Apfel, 95 Civ. 2832 (LAP), 1998 WL 171460 at *3-*4 (S.D.N.Y. Apr. 13, 1998) (Preska, D.J.); see also

Monette v. Astrue, 269 F. App'x 109, 112 (2d Cir. 2008) (summary order) ("In circumstances where an ALJ has reason to question the onset date of disability, the best practice may be to solicit the views of a medical expert.").

One of the principal issues with respect to plaintiff's claim is whether plaintiff required the use of a cane prior to his DLI (See Tr. 1139-41 (vocational expert testifying that plaintiff would not be capable of doing "light work" if he can stand and walk with the use of a cane for 90 minutes in an eight-hour work day)).  In his May 13, 2013 decision, ALJ Solomon concluded plaintiff did not require use of a cane, according "significant weight" to Dr. Kulak's opinion, as set forth in Dr. Kulak's 1998 Interrogatory Responses, that plaintiff could walk for four to six hours in an eight-hour work day (Tr. 1075). However, Dr. Kulak's interrogatory responses do not address whether plaintiff required the use of a cane to walk or stand.[39] Accordingly, on remand, SSA may wish to further develop the

---

[39]Unlike the residual physical functional capacity assessments completed by Dr. Shapiro, Dr. Cordice and E. Schulman (Tr. 488, 581, 649), Dr. Kulak's interrogatory responses did not address whether plaintiff had a medical need for a cane in order to walk (Tr. 680).

record by re-contacting Dr. Kulak and ascertaining his opinion
with respect to this issue.[40]

In addition, to the extent ALJ Solomon decided he could
not find severe impairments of plaintiff's left knee and cervical
spine because the record "does not contain diagnostic tests
confirming left knee o[r] cervical impairments and therefore [he]
can find no medically determinable impairment (MDI) in accordance
with the regulations of Social Security Administration" (Tr.
1073), he erred.  Contrary to the ALJ's contention, diagnostic
tests are not required for a finding of a disability; rather,
"[m]edically acceptable clinical diagnostic techniques include
diagnoses based entirely upon a patient's symptomology." Kraemer
v. Apfel, 97 Civ. 8638 (AGS), 1999 WL 14684 at *4 (S.D.N.Y. Jan.
14, 1999) (Schwartz, D.J.), on reconsideration, 1999 WL 66524
(S.D.N.Y. Feb. 10, 1999) (Schwartz, D.J.); see also Green-Younger
v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) ("As a general

---

[40]I also note that, as plaintiff argues in his motion
papers, the ALJ's decision appears to misstate the relevant
inquiry concerning plaintiff's use of a cane (Pl. Memo, at 22).
In his May 13, 2013 decision, ALJ Solomon states that "the
records do not indicate that claimant needed a cane all the time"
(Tr. 1074).  A finding that plaintiff needs a cane all the time
is not required to find that plaintiff is disabled or incapable
of doing certain types of work.  See 20 C.F.R. § 416.967(b) ("To
be considered capable of performing a full or wide range of light
work, you must have the ability to do," among other things, "a
good deal of walking or standing"); accord 20 C.F.R. § 404.1567.

matter, 'objective' findings are not required in order to find
that an applicant is disabled."); <u>Cutler v. Weinberger</u>, 516 F.2d
1282, 1286-87 (2d Cir. 1975) ("While a claimant must show that
the physical or mental impairment by reason of which he claims to
be disabled 'results from anatomical, physiological, or psycho-
logical abnormalities which are demonstrable by medically accept-
able clinical and laboratory diagnostic techniques,' 42 U.S.C. §
423(d)(3), this does not mean that medical opinion must necessar-
ily be supported by 'objective' clinical or laboratory find-
ings.").

      Further, to the extent the ALJ relied on lacunae in the
record to support his conclusion concerning plaintiff's disabil-
ity, he erred.  An ALJ cannot rely on an absence of evidence to
support a finding concerning disability.  <u>See</u> <u>Rosa v. Callahan</u>,
<u>supra</u>, 168 F.3d at 81 (finding that the Commissioner was "pre-
cluded from relying on the consult[ing examiners'] omissions as
the primary evidence supporting [the] denial of benefits");
<u>Spellman v. Shalala</u>, 1 F.3d 357, 363 (5th Cir. 1993) (Appeals
Council's finding regarding the onset date based on an absence of
evidence prior to a certain date was not "sufficient to support a
finding that an impairment did not exist at a disabling level of
severity").  For example, in his May 13, 2013 decision, ALJ
Solomon appears to rely on the fact that several treatment notes,

as well as Dr. Seo's report, do not reference a cane to support his determination that plaintiff did not require a cane (Tr. 1076).[41]  On remand, the Commissioner should not rely primarily the absence of evidence to support any finding concerning disability.

On remand, the SSA should also reconsider how much weight, if any, to accord Dr. Graham's assessments of plaintiff's residual functional capacity.  In his May 13, 2013 decision denying plaintiff's application, ALJ Solomon "accord[ed] some weight" to Dr. Graham's findings that plaintiff "had no restrictions in his ability to sit, stand, walk, lift or carry objects" (Tr. 1075-76).  However, as noted by the Appeals Council in its February 7, 2001 remand order concerning plaintiff's 1996 SSI application, Dr. Graham "did not quantify the extent of the

_____

[41]I also note that, although the ALJ stated that he relied on Dr. Seo's report to the same extent he relied on Dr. Graham's two reports (Tr. 1075-76), the May 13, 2013 decision provides a relatively complete summary of Dr. Graham's findings and observations while only referencing those aspects of Dr. Seo's report that support a finding that plaintiff was not disabled. Specifically, the ALJ notes that Dr. Seo wrote that plaintiff presented with a normal gait and was able to get on and off the exam table without difficulty, as well as the fact that the report makes no reference to a cane (Tr. 1076).  However, the ALJ does not discuss that Dr. Seo diagnosed plaintiff with "[l]ow back derangement," noted that plaintiff had difficulty standing, sitting and walking for prolonged periods and opined that plaintiff can sit and stand for only four hours in an eight-hour workday, can "walk a few blocks" and can lift and carry "20+" pounds (Tr. 588-89).

claimant's ability in these areas of functioning" and "his vague statements regarding the claimant's functional capacity are insufficient to establish that the claimant retains the [residual functional capacity] for sedentary work" (Tr. 143-44, <u>citing Curry v. Apfel</u>, 209 F .3d 117, 123, n.1 (2d Cir. 2000)).  <u>See Munford v. Apfel</u>, 97 Civ. 5270 (HB), 1998 WL 214782 at *5 (S.D.N.Y. Apr. 30, 1998) (Baer, D.J.) ("Dr. Graham's assessments that plaintiff could sit, stand, walk, lift, carry, handle ob-jects, hear, speak and travel are too vague to constitute sub-stantial evidence of plaintiff's abilities" (citation and inter-nal quotation marks omitted)), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>on</u> <u>recon-sideration</u>, 1998 WL 684836 (S.D.N.Y. Sept. 30, 1998) (Baer, D.J.); <u>Burris v. Chater</u>, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.) (same).

Finally, to aid the SSA's review of plaintiff's appli-cation and its calculation of benefits on remand, I note that the ALJ did not address the following record evidence concerning plaintiff's alleged disability in either the April 17, 2013 hearing or the May 13, 2013 decision.  First, and most important, the ALJ did not address Dr. Kulak's September 4, 1986 report, in which he notes plaintiff's diagnosis of chondromalacia of the right patella, inflamation of the sacroiliac joint and cervical and lumbosacral spine spasms (Tr. 686-87).

Similarly, the ALJ does not appear to have addressed the two notes from the Ryan Center in 1991 and 1992 that discuss a surgery on plaintiff's left knee that apparently occurred in 1986 (Tr. 305, 313); nor did the ALJ address Dr. Ergas' 1988 report indicating left knee impairments and a left knee surgery (Tr. 641).  The ALJ also failed to address E. Schulman's 2001 residual physical functional capacity assessment for the time period from May 1989 through 2001 (Tr. 648-55).

Lastly, the ALJ's May 13, 2013 decision does not directly address any of the evidence concerning plaintiff's medication and the effects his medication had on his stomach.  On remand, SSA should consider this evidence in evaluating plaintiff's application.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, I respectfully recommend that plaintiff's motion for judgment on the pleadings be denied and that defendant's motion for remand be granted in part.  I further recommend that the matter be remanded to the Commissioner to (1) determine whether plaintiff is a <u>Stieberger</u> class member with respect to both his purported 1984 SSI application and his 1984 DIB application and (2) determine whether plaintiff was disabled for the applicable time period

and, if so, his disability onset date so as to calculate the

benefits defendant now concedes plaintiff is owed.[42]

--------

[42]In his opposition papers to defendant's motion, plaintiff
requests that, in the event his claim is remanded for further
proceedings, the court issue an Order finding plaintiff disabled
as of November 1996 and directing the Commissioner to address the
period from 1984-1996 or certify plaintiff as a Stieberger
member.  Plaintiff also requests that the Commissioner be
directed to render a final administrative decision within 120
days of any remand or else pay benefits effective with
plaintiff's 1984 application, relying on Butts v. Barnhart, 416
F.3d 101 (2d Cir. 2005) (Plaintiff's Memorandum in Opposition to
the Commissioner's Motion to Remand, dated July 29, 2016 (D.I.
29), at 3).  I conclude that both of plaintiff's requests should
be denied.

     With respect to a finding he was disabled as of 1996,
plaintiff has already been found disabled as of November 1996
pursuant to his 1996 SSI application (Tr. 65-66).  Given that
determinations of disability under DIB and SSI are assessed under
the same standard, see Bowen v. City of New York, 476 U.S. 467,
470 (1986), it is unclear why plaintiff now seeks a judicial
declaration on an issue that SSA has already found in plaintiff's
favor and that is not currently in dispute.  More importantly,
because plaintiff's entitlement to benefits on the present
application depends on whether he is a Stieberger member and
whether he was insured as of the onset of his disability, it
would appear that a declaration that plaintiff was disabled as of
November 1996 would have little impact on his entitlement to
benefits.  With respect to the request for a time-limit on the
resolution of plaintiff's claim, Butts v. Barnhart is
distinguishable from the present case.  Butts involved a remand
only for a determination as to Step Five of the five-step
procedure for evaluating claims, where the burden of proof falls
on the Commissioner, and the Court of Appeals' specifically
stated that its holding that a breach of the time-limit would
result in an entitlement to benefits "is limited to cases where
the claimant is entitled to benefits absent the Commissioner's
providing expert vocational testimony about the availability of
appropriate jobs."  Here, in contrast, whether or not plaintiff
has a disability at all, and when that disability ensued, remain
(continued...)

V.  <u>Objections</u>

          Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Paul G. Gardephe, United States District Judge, 40 Foley Square, Room 2204, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Gardephe.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

_____

[42](...continued)
open questions.  Therefore, <u>Butts</u> is inapplicable.

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:   New York, New York
         August 22, 2016

                              Respectfully submitted,

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel of Record

64